**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| NOVEDEA SYSTEMS, INC. and ANAND DASARI | § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO.:  6:20-cv-180-JDK |
| v. | § § | JURY TRIAL DEMANDED |
| COLABERRY, INC. and RAM KATAMARAJA | § § § | |
| Defendants. | § § § | |

**COLABERRY, INC.'S ANSWER AND COUNTERCLAIMS
TO PLAINTIFFS' VERIFIED SECOND AMENDED COMPLAINT**

Defendant Colaberry, Inc. ("Defendant" or "Colaberry") respectfully submits this Answer in response to the Verified Second Amended Complaint of Plaintiffs Novedea Systems, Inc. and Anand Dasari ("Plaintiffs" or "Novedea" or "Dasari"), as follows:

## I.   ANSWER TO VERIFIED SECOND AMENDED COMPLAINT

**A. Parties**

1. Admitted.

2. Defendant is without knowledge sufficient to admit or deny the allegations contained in this paragraph and therefore denies them.

3. Admitted that Colaberry is a Delaware corporation organized and existing under the laws of the state of Delaware. Denied that Colaberry is headquartered in Texas.

4. Admitted.

**B. Jurisdiction and Venue**

5. Admitted.

6. Defendant is without knowledge sufficient to admit or deny the allegations contained in this paragraph and therefore denies them

7. Admitted that Plaintiffs are seeking a declaratory judgment under Fed. R. Civ. P. 57 and 28 U.S.C. §§ 2201 and 2202.

8. Denied.

**C. BACKGROUND FACTS**

9. Denied.

10. Admitted that Novedea was incorporated before Colaberry. Admitted that in 2012, Ram Katamaraja purchased 7,500 shares of Novedea from Mr. Govindarajan and Ms. Dasyam. Admitted that on February 27, 2012, Novedea held an organizational meeting that Ram Katamaraja attended as the sole shareholder and sole Director of Novedea. Admitted that on February 27, 2012, Ram Katamaraja was appointed Novedea's President and Chief Executive Officer and Dasari was appointed the company Secretary. Admitted that Novedea is a Texas corporation. The remainder of this paragraph is Denied.

11. Admitted that Dasari became COO of Novedea in 2014 and was handling the front-end job of sales and training through analog teaching methods and lectures in classrooms. Admitted that Dasari made a number of risky business decisions that negatively impacted Novedea. Admitted that Katamaraja is currently Novedea's CEO and has been since 2012. Denied that Dasari was responsible for Novedea's day-to-day operations and strategic direction.

12. Denied.

13. Admitted that Dasari taught classes at Novedea. The remainder of this paragraph is Denied.

14. Admitted that Dasari remained in Plano, Texas. Admitted that Katamaraja moved to Boston.

Admitted that Katamaraja pursued a graduate degree. The remainder of this paragraph is Denied.

15. Denied.

16. Defendant is without knowledge sufficient to admit or deny the allegations contained in this paragraph and therefore denies them.

17. Denied.

18. Admitted that on January 5, 2012, Ram Katamaraja incorporated Colaberry with himself as the sole owner and Director. Admitted that on January 5, 2012, Ram Katamaraja as sole Director appointed himself as President and Treasurer and authorized the issuance of 1,500 no par value shares of common stock to himself. Admitted that on January 5, 2012, Ram Katamaraja appointed Dasari as secretary of Colaberry. Admitted that on or about January 22, 2012, Ram Katamaraja conveyed 750 of his 1,500 common stock shares in Colaberry to Dasari. Admitted that Stock Certificate number 2, dated January 22, 2012 issued 750 shares of Colaberry common stock to Dasari. Admitted that on January 22, 2012, Ram Katamaraja owned 750 shares of Colaberry common stock. The remainder of this paragraph is Denied.

19. Denied.

20. Admitted that Colaberry and Noveda executed a Master Agreement  on September 9, 2014 and in that agreement Novedea agreed to support Colaberry's operations and software development as a contract services provider. The remainder of is paragraph is Denied.

21. Admitted that Colaberry began operations in 2014 with Ram Katamaraja as an officer and sole Director. Admitted that Dasar**i** and Ram Katamaraja owned 50% of Novedea. The remainder of this paragraph Denied.

22. Denied.

23. Denied.

24. Denied.

25. Denied.

26. Denied.

27. Denied.

28. Denied.

29. Denied.

30. Denied.

31. Admitted that Defendant recognized that a business separation was necessary, and discussions were commenced. The remainder of this paragraph is Denied.

32. Denied.

33. Denied.

34. Denied.

35. Denied.

36. Admitted that Filtered was spun out as a separate company and that Dasari was not an employee or officer of Filtered. The remainder of this paragraph is Denied.

37. Denied.

38. Denied.

39. Admitted that Achieve Partners expressed interest in investing in Colaberry. The remainder of this paragraph is Denied.

40. Admitted that the parties signed a Letter of Intent evidencing Colaberry's intent to purchase Dasari's shares of Colaberry. Admitted that it was agreed upon that Pallavi would resign after the deal was completed. Admitted that funds were deposited with an escrow company and that the LOI states: "Colaberry, Novedea, Dasari, and Katamaraja shall use their best efforts to close on the

purchase and sale transactions set forth herein (the Closing") on the Execution Date or within forty-five (45) thereafter (to accommodate Colaberry's need to arrange sufficient debt financing to completion the contemplated transactions), but in any event within five (5) business days after the satisfaction of all conditions specified in Section 9 below and as may be further contained in the P&S Agreements. The Closing shall take place virtually by the exchange and delivery of signed documents via facsimile, email or similar communication reasonably acceptable to the parties hereto." Denied that Dasari cooperated to complete the sales process in good faith.

41. Defendant lacks knowledge sufficient to admit or deny the allegation that "right after the LOI was signed, Colaberry called a meeting announcing the company was buying out Dasari's shares and that he and his wife, Pallavi, would be leaving the company." Admitted that Colaberry was forced to find new office space for its operations after its lease expired on December 31, 2019. The remainder of this paragraph is Denied.

42. Denied.

43. Denied that "Ram and Colaberry disregarded this instruction and continued to improperly use LMS, harming Novedea and Dasari." The remainder of this paragraph is Admitted.

44. Denied.

45. Admitted that Dasari's employment at Colaberry was terminated. Admitted that Dasari's termination letter dated April 16, 2020 stated the following:

> "The Company will direct deposit your final paycheck within the next six days."
>
> "Effective at the time you were notified of your termination, you are no longer permitted to access our electronic systems, computers, e-mail, servers, cloud-based storage or portals, software, or any similar device or access point. This includes requesting other Company employees to access a system/devise/access point on your behalf. Any attempts to access our data, information, documents, programs, electronic systems, computers, e-mail, servers, cloud based storage or portals, or

> similar, either directly or indirectly, will be viewed as a violation of the Computer Fraud and Abuse Act, 18 U.S. Code § 1030. If we determined that your conduct violates this law, which includes both civil and criminal penalties, we will take appropriate legal action."

> "You may no longer represent yourself as an employee of our Company and you may not come onto any Company property."

> "As a Company officer and *major shareholder* you were privy to the Company's confidential and trade secret information. Your fiduciary duties include maintaining the confidentiality of any Company confidential information/trade secrets. This obligation survives the termination of your employment."

The remainder of this paragraph is Denied.

46. Admitted that Colaberry and Ram Katamaraja filed a lawsuit in the Court of Chancery of the State of Delaware on April 20, 2020 seeking a declaration that the termination of Anand Dasari by the Colaberry Board of Directors on April 16, 2020 was valid and legal and other relief. The remainder of this paragraph is Denied.

47. Admitted that after Dasari's termination his access to Novedea's operating bank account was revoked. The remainder of this paragraph is Denied.

48. Admitted that on April 27, 2020, Novedea Systems, Inc. and Ram Katamaraja filed suit against Anand Dasari in the Texas District Court of the 471st Judicial District that is located in Collin County. The remainder of this paragraph is Denied.

49. Admitted that Dasari's wife was offered a choice to accept a new managerial role at Colaberry with no change in salary or to resign from the company, and she subsequently refused the new managerial role. Admitted that on May 18, 2020, Colaberry sent Pallavi a communication "accepting your resignation, effective today." The remainder of this paragraph is Denied.

50. Denied.

## COUNT 1 – COPYRIGHT INFRINGEMENT

51. Each of the incorporated paragraphs are admitted or denied as described above.

52. Denied.

53. Denied.

54. Denied.

55. Denied.

56. Denied.

57. Denied.

58. Denied.

## COUNT 2 – DECLARATORY JUDGMENT

59. Each of the incorporated paragraphs are admitted or denied as described above.

60. Denied.

61. Denied.

62. Admitted only that Dasari and Katamaraja own 50% each of Novedea.

63. Denied.

64. Admitted that on January 5, 2012, Ram Katamaraja incorporated Colaberry with himself as the sole owner and Director. Admitted that on January 5, 2012, Ram Katamaraja as sole Director appointed himself as President and Treasurer and authorized the issuance of 1,500 no par value shares of common stock to himself. Admitted that on January 5, 2012, Ram Katamaraja appointed Dasari as secretary of Colaberry. Admitted that on or about January 22, 2012, Ram Katamaraja conveyed 750 of his 1,500 common stock shares in Colaberry to Dasari. Admitted that Stock Certificate number 2, dated January 22, 2012 issued 750 shares of Colaberry common stock to Dasari. Admitted that on January 22, 2012, Ram Katamaraja owned 750 shares of Colaberry

common stock. The remainder of this paragraph is Denied.

65. Denied.

66. Denied.

67. Denied.

## COUNT 3 – LANHAM ACT VIOLATIONS

68.   Each of the incorporated paragraphs are admitted or denied as described above.

69.   Denied.

70. Denied.

71. Denied.

72. Denied.

73. Denied.

## COUNT 4 – BREACH OF CONTRACT

74.   Each of the incorporated paragraphs are admitted or denied as described above.

75.   Denied.

76. Denied.

77. Denied.

78. Denied.

79. Denied.

## COUNT 5– BREACH OF FIDUCIARY DUTY

80.   Each of the incorporated paragraphs are admitted or denied as described above.

81. Admitted that Katamaraja has a fiduciary duty to Novedea. The remainder of this paragraph

is Denied.

82. Denied.

83. Denied.

## COUNT 6– NOVEDEA SHAREHOLDER DERIVATIVE CLAIMS

84. Each of the incorporated paragraphs are admitted or denied as described above.

85. Denied.

86. Denied.

87. Denied.

## II.  DEMAND FOR JURY TRIAL

88. Defendant requests a trial by jury on all issues so triable.

## III.  RESPONSE TO REQUEST FOR RELIEF

Defendant denies that Plaintiffs are entitled to any of their requested relief.

## IV.  AFFIRMATIVE DEFENSES

### First Defense – Failure to State a Claim

89. Plaintiffs' Second Amended Complaint fails to state a claim upon which relief can be granted, including the grounds set forth in the Defendants' motions to dismiss.

### Second Defense – Non-infringement

90. Defendant does not and has not infringed, either directly, indirectly, contributorily, or by inducement the Plaintiffs' alleged copyright.

### Third Defense – Unenforceability Due to Inequitable Conduct

91. Plaintiffs' copyright is invalid due to inequitable conduct, as alleged herein in the counterclaims below and incorporated here by reference.

### Fourth Defense – Unenforceability by Copyright Misuse and/or Unclean Hands

92. Plaintiffs' claims are barred in whole or in part by the doctrine of copyright misuse, as alleged herein in the counterclaims below and incorporated here by reference. Plaintiff's claims are further barred under the doctrine of unclean hands.

### Fifth Defense – Lack of Ownership

93. Plaintiffs are not the owner of one or more of the copyrights at issue.

### Sixth Defense – Statute of Limitations

94. Plaintiffs copyright claims are barred by the statute of limitations as set for in 17 U.S.C. § 507.

95. Plaintiffs breach of fiduciary duty claims are also barred by the statute of limitations as set forth in Tex. Civ. Prac. & Rem. Code § 16.004.

### Seventh Defense – Acquiescence

96. Plaintiffs have acquiesced in any alleged copyright infringement.

### Eighth Defense – Estoppel

97. Plaintiffs' copyright claims are barred by estoppel.

### Ninth Defense – No Statutory Damages or Attorneys' Fees

98. Plaintiffs are barred by 17 U.S.C. § 412 from claiming statutory damages or attorney's fees under the Copyright Act in that any alleged acts of infringement occurred before first registration of the Plaintiff's alleged work.

### Tenth Defense –Independent Development

99. Plaintiffs' copyright claims are barred because Defendant independently developed its accused software.

### Eleventh Defense – False Advertising Claims Are Improper in Conjunction with Copyright Infringement Claims

100. Plaintiffs are barred by law from seeking damages for both false advertising and copyright infringement as described by the Supreme Court in *Dastar Corp. v. Twentieth Century Fox Film Corp.* and Fifth Circuit precedent.

### Twelfth Defense – Lack of Authority

101. Novedea's alleged attorneys lack the legal authority to file or maintain this lawsuit on

behalf of Novedea.

## Thirteenth Defense – Statute of Frauds

102. Plaintiff's breach of contract claim is barred by the Statute of Frauds. Tex. Bus. & Com. Code § 26.01.

## Fourteenth Defense – Indefinite

103. Plaintiff's breach of contract claim fails because the purported contract is missing essential terms and therefore unenforceable.

## Fifteenth Defense – Waiver

104. Plaintiff's breach of contract claim fails because Plaintiffs have acted inconsistent with the alleged agreement, thereby waived their right to enforce the alleged contract.

## Sixteenth Defense – Copyright Invalid

105. Plaintiffs' copyright claims fail because the alleged copyright is invalid under 17 U.S.C. § 411(b)(1).

## Seventeenth Defense – Colaberry Articles of Incorporation

106. Dasari's declaratory judgment claims are barred by provisions in the Colaberry Operative Certificate of Incorporation adopted in conformity with 8 Del. C. § 102(b)(7) on January 5, 2012 and as amended in the February 21, 2018 Amended and Restated Certificate of Incorporation by Colaberry, Inc.

## Eighteenth Defense – Colaberry Bylaws

107. Dasari's declaratory judgment claims are barred, in whole or in party, by provisions in the Colaberry bylaws adopted in conformity with 8 Del. C. § 142(b), which empower Katamaraja, as sole director, to remove officers with or without case. And Colaberry, acting under instructions from board member Katamaraja, has the power to make decisions such as hiring and firing of executives

and the court gives deference to these decisions under the business judgment rule.

### Nineteenth Defense – Unclean Hands, Estoppel, Waiver, or Laches

108. Dasari's claims are barred, in whole or in part, by the doctrines of unclean hands, estoppel, waiver, or laches.

### Twentieth Defense – Ratification

109. Dasari's claims are barred, in whole or in part, by his own ratification of the acts undertaken by Katamaraja.

### Twenty First Defense – Unjust Enrichment

110. Dasari's claims are barred, in whole or in part, by the doctrine of unjust enrichment.

### Reservations of Defenses

111. Defendant reserves all affirmative defenses under Rule 8(c) of the Federal Rules of Civil Procedure, the Patent Laws of the United States, and any other defenses at law or in equity that may exist now of that may be available in the future based on discovery and further factual investigation in this action.

112. Defendant reserves the right to amend or add such additional separate affirmative defenses that may become available during discovery or at trial and conform any such additional defenses that it may have to the evidence as permitted by Fed. R. Civ. P. 15(b).

## V.   COUNTERCLAIMS

**A. Parties**

113. Upon information and belief, Anand Dasari ("Dasari" or "Counterclaim-Defendant") is an adult resident of the Eastern District of Texas.

114. Ram Katamaraja ("Katamaraja" or "Counterclaim-Plaintiff") is an adult resident of Massachusetts.

115. Colaberry, Inc. ("Colaberry") is a Delaware corporation headquartered in Boston,

Massachusetts.

116. Novedea Systems, Inc. ("Novedea") is a Texas corporation with its principal place of business in Plano, Texas.

**B. Jurisdiction and Venue**

117. The Court has jurisdiction over this counterclaim pursuant to 28 U.S.C. §§ 1367, 1331, and 1338(a).

118. Venue is proper in the Eastern District of Texas under 28 U.S.C. §§ 1391(b) and (c) as well as Tex. Civ. Prac. & Rem. Code § 15.002 because Counterclaim-Defendant resides in this judicial district, Counterclaim-Defendant has conducted business in this District, or because a substantial part of the events or omission giving rise to the claims herein occurred in this District.

119. This Court has personal jurisdiction over Counterclaim-Defendant in this action because (i) Counterclaim-Defendant has subjected himself to personal jurisdiction by suing Colaberry and Katamaraja in this District and (ii) Counterclaim-Defendant resides within this District.

**C. The History of Novedea.**

120. Novedea was incorporated as a Texas corporation on May 26, 2005.

121. Originally, Novedea's business pursuit was to train and place workers at information technology (IT) companies throughout the United States, with an emphasis on placing workers who are citizens of the United States or India.

122. The Articles of Incorporation filed May 26, 2005, authorized issuance of ten thousand (10,000) shares.

123. Currently, Novedea's primary business focus has been providing general business technology consulting services as a sub-vendor to other large contingent staffing companies.

124. From about 2006 to 2008, Katamaraja was a H1B visa employee of Novedea.

125. On or about 2010, Novedea issued Katamaraja 2,500 shares of common stock, which

represented 25% of Novedea's issued and outstanding shares at that time.

126. Katamaraja was subsequently appointed as a member of Novedea's Board of Directors.

127. From 2005 to 2013, Dasari was a H1B visa employee of Novedea.

128. But in December 2011, one of the owners of Novedea (not Katamaraja) attempted to fire Anand from his position of Sr. Software engineer.

129. This created a dispute amongst the owners of Novedea.

130. Katamaraja worked to stop the Dasari's termination in order to save his job and his immigration status.

131. At that time, Mr. Govindarajan was the largest shareholder of Novedea and had primary responsibility for the management of the business.

132. On January 5, 2012, Katamaraja incorporated Colaberry Inc. as the sole owner and Director.

133. As the sole Director, Katamaraja appointed himself as Colaberry's President and Treasurer, and authorized the issuance of 1,500 no par value shares of common stock to himself.

134. On or about January 22, 2012, Katamaraja appointed Dasari to be the corporate secretary of Colaberry and transferred 750 common stock shares in Colaberry to Dasari.

135. Mr. Govindarajan and one of the other principals undertook certain actions and decisions that Katamaraja believed would harm Novedea.

136. Accordingly, Katamaraja and Dasari filed a lawsuit against the other owners in the 68th Judicial District court of Dallas County on January 27, 2012 to enjoin them from continuing those actions and to protect Dasari's job and immigration status.

137. At the time of the lawsuit, Katamaraja believed that Dasari owned 17.5% of Novedea's shares and was a Director.

138. But it turned out that Dasari did not own any shares of Novedea and was not a Director.

139. Instead, Novedea's corporate records from February 27, 2012 showed the Mr. Govindarajan and Ms. Manjula Dasyam collectively owned 7,500 shares of the 10,000 total shares that had been issued by Novedea and Katamaraja owned the remaining 2,500 shares.

140. As part of the settlement of this lawsuit, Katamaraja purchased the 7,500 Novedea shares owned by Mr. Govindarajan and Ms. Manjula.

141. After that purchase, Katamaraja owned 100% of Novedea's shares.

142. On February 27, 2012, Novedea held an organizational meeting that was attended by Katamaraja as the sole shareholder and sole Director of the company.

143. At that meeting, Katamaraja was appointed to be Novedea's President and Chief Executive Officer and Dasari was appointed to be the Novedea's Secretary.

144. Around this same time, Katamaraja transferred 50% of his shares in Novedea to Dasari.

145. From 2012 until 2014, Dasari was a Sr. Software Engineer at Novedea who primarily focused on Novedea's front-end job of sales and training through analog teaching methods and lectures in classrooms.

146. Katamaraja, as Chief Executive Officer, focused more on Novedea's business development, consulting engagements, operations, information technology, immigration, and finances.

147. In early 2012, Novedea brought in Ali Muwwakkil ("Muwwakkil") to become another part-time recruiter for the company.

148. At this time, Katamaraja believed there were growth opportunities if the business pivoted to become a direct-to-customer service provider that provides business technology consulting and employee training services directly to its customers rather than through the customers' vendors.

149. Muwwakkil also recognized the benefits of building a computer-based tool to help improve training and expand Novedea's operations.

150. Muwwakkil approached Dasari about the idea, but Dasari told him it was not needed.

151. Muwwakkil persisted and continued discussions with Katamaraja and asked Katamaraja to recommend an approach to take to build the proof of concept for the online tool.

152. Subsequently throughout 2012, Muwwakkil and Katamaraja discussed creating an online tool to deliver training programs.

153. Dasari was not involved in this development work.

154. Katamaraja recommended using the opensource DotNetNuke ("DNN") platform for this development work because Muwwakkil was familiar with these platforms.

155. Muwwakkil registered NovedeaTraining.com, and Muwwakkil and Katamaraja worked together to develop the new tool using DNN over the next several quarters.

156. Unfortunately, Novedea started encountering obstacles to growth due to limitations from the analog teaching methods, business model, and operational constraints.

157. Around the second quarter of 2012, Muwwakkil and Katamaraja worked after hours to set up, configure and design a learning tool by modifying various features of the DNN platform.

158. Katamaraja was involved in creative / architecture aspects and Muwwakkil was involved in set up, configure and design aspects.

159. Unlike a traditional learning management system, Novedea's DNN-based solution was designed to use gamification principles with 10 gaming levels that simulated a military boot camp ranking system.

160. Muwwakkil is a Marine Corps veteran so he designed the system to reflect 10 military ranks starting with Private First Class and graduating with General rank when the boot camp is

successfully completed.

161. Muwwakkil and Katamaraja called it CRM - Class Room Management system.

162. During the third quarter of 2012, Katamaraja worked on website designs of Novedeatraining.com and handed over the designs to Muwwakkil.

163. Muwwakkil launched the beta version of CRM to test internally and started loading content that is documented by him, as well as aggregating external content resources such as articles, videos, assignments, quizzes etc. from the internet.

164. During the fourth quarter of 2012, Novedeatraining.com launched and allowed external users to register for classes through the website.

165. Muwwakkil started gathering data around student activity and introduced red / yellow / green light systems that will show the students in real time of their performance data and make them accountable.

166. Katamaraja also introduced electronic signature capture to collect signatures electronically through the system.

167. During the first quarter of 2013, Katamaraja introduced a concept called "Project Realize American Dream" with the goal of helping 100,000 people get jobs.

168. A problem that emerged at this time was a poor ratio of interviews to hires.

169. To try and solve this, Muwwakkil and Katamaraja worked on creating the "Interview Prep" module and corresponding processes were automated to improve interview outcomes.

170. However, because the open source DNN platform was not feature-rich and flexible enough for business intelligence reporting, Muwwakkil started building a Qlikview dashboard of students performance data so that he could collect data using the open source DNN system and visualize it with better color coding and drill down/through reporting.

171. Around this time, Muwwakkil renewed the novedeatraining.com domain for one year.

172. During the second quarter of 2013, Katamaraja introduced the Net Promoter Score (NPS) survey to start collecting customer satisfaction information.

173. Katamaraja also started working on introducing Big Data and Data Science programs and concepts into the system.

174. As the "Interview Prep" module started improving results, Muwwakkil and Katamaraja realized that trainees were still failing at client interviews because they lacked experience working on real world projects.

175. Katamaraja discussed this problem with Dasari and Muwwakkil, and Katamaraja introduced the concept of working on virtual projects.

176. Katamaraja took the lead on creating the project requirements for the first virtual project using publicly available mortgage data.

177. During the third quarter of 2013, the trainees were still not able to work on the virtual project independently as it was too complex for them.

178. Katamaraja then proposed using an 'IKEA Model' to assist trainees in the project work.

179. Katamaraja created a full solution for the virtual mortgage project along with detailed instructions on how to go about implementing the project.

180. This solution became part of the CRM and was a very effective tool for the trainees to gain real world work experience as it allowed them to work on complex projects with ease.

181. Katamaraja later wrote a book titled "SQL Server 2012 Mortgage Project Book" about this.

182. During the fourth quarter of 2013, the CRM reached a milestone of 100 certified students.

183. However, the interview to hire ratios were still not improving.

184. Katamaraja looked deeper into the problem and realized that working on a virtual project

is not enough unless the trainees know how to clearly articulate the work that they had completed.

185. Katamaraja discussed with Muwwakkil, and they decided to experiment with introducing video recording assignments as part of the training.

186. Katamaraja and Muwwakkil launched a pilot with the open-source plugin because it was the easiest way to introduce a video recording feature in the open source DNN platform.

187. The results of this experiment were positive.

188. So Katamaraja worked with Muwwakkil to start looking at introducing full-lifecycle management into the CRM.

189. Unfortunately, student confusion arose when Dasari unilaterally sent out conflicting email instructions to trainees without understanding how the system was evolving.

190. Around this time, Muwwakkil joined Novedea with a retainer fee and commission.

191. In 2014, after Dasari received his green card and Katamaraja appointed Dasari to be Novedea's Chief Operating Officer.

192. During the first quarter of 2014, the preliminary results of video assignments were showing promise.

193. Katamaraja started working on creating a custom video recording platform so that it could work seamlessly with the technology platform in place.

194. Muwwakkil and Katamaraja then worked on replacing the open-source module with the new custom-built video recording software.

195. During this time, Murali Mallina ("Mallina") joined the team and started exploring the opportunities to contribute in areas such as share point training, as well as real estate related projects.

196. During the second quarter of 2014, Novedea's management team realized that its third-

party placements model was not scalable and that Novedea needed to evolve into a transparent direct to client business model.

197. Dasari was a big believer in the third-party placement model as it is easy business, but Katamaraja was a big believer in the direct client business model because he felt that was more sustainability even if it was more difficult to build that business in the beginning.

198. Mallina had a strong developer background so Katamaraja encouraged him to study the possibility of building a new platform that would be more flexible, scalable and potentially help to achieve the direct client business.

199. Because Mallina is a coder, a decision was made to officially engage him to lead building a new technology platform from scratch in collaboration with Muwwakkil and Katamaraja.

200. The Novedea management team, including Dasari, decided to transition software development and operations towards Colaberry as part of this new direction.

201. So it was decided that the new platform would be launched under the Colaberry.com brand and the Novedeatraining.com opensource DNN platform would be sunset gradually.

202. Colaberry.com would operate under Colaberry, Inc. as a separate entity with a clean slate.

203. And Novedea would provide contracting resources to help get Colaberry up and running.

204. Novedea had the right to access all Colaberry training graduates without paying any talent acquisition fee to Colaberry and services provided by Novedea would be billed to Colaberry.

205. Due to the arrangement with Colaberry, Novedea not only saved on the talent acquisition cost, but also benefited immensely by focusing all its resources on core staffing business, generating millions of dollars of revenue by placing trained graduates in contracts jobs, software development revenue, preferred vendor revenue, and office space rental revenue.

206. As Colaberry's business grew, it provided millions of dollars of business to Novedea as a

preferred supplier.

207. Dasari was aware of all these decisions and transitions in business models, branding, and software platforms from Novedea to Colaberry.

208. For example, in May 2014, Mallina, who at the time was Novedea's Chief Technology Officer and Business Information Solutions Architect, sent the email below about the initiation of rebranding of Novedeatraining.com to Colaberry.com with the opensource DNN platform, which copied Dasari:

From: Murali Mallina murali@novedea.com
Subject: NOVEDEA Training (NovedeaTraining.com) is now Colaberry School Of Data Analytics (Colaberry.com)
Date: May 7, 2014 at 4:28 PM
To: Ali Muwwakkil ali_muwwakkil@hotmail.com, Alex Gibson alexgibsondollars@gmail.com, Ram ram@novedea.com, Anand Dasari anand.dasari@gmail.com, Kishan kishanchandra.mcp@gmail.com, chaitanya chaitu.sagam@gmail.com, satya batchu sbatchu1@gmail.com, Rajneesh Yadav rajneeshyadav18@gmail.com, harsha.9977@gmail.com, Gona Srikanth gona.srikanth@gmail.com, Forrest Jones Forrest.Jones@novedea.com, Accounts @Novedea accounts@novedea.com

Hi All,

Rebranding of Novedea Training into Colaberry School Of Data Analytics has begun.

As a first step, the Novedeatraining.com website is now redirected to the new Colaberry.com URL.

- All your existing Novedeatraining.com links and bookmarks will work seamlessly. Once you open a Novedeatraining.com link, it will redirect to corresponding page on Colaberry.com.
- Its essentially the same application, accessed on a different URL. So all content, your access user id/password etc. will all remain the same and work just the same way.

We will start using the new URL, Contact Email and Phone Numbers in all advertisements and information emails from now. I have already updated all contact information accordingly on the website.

URL : http://www.colaberry.com
Email : Training@Colaberry.Zendesk.com
Ph: 972-992-1024

All Email notifications from the Admin/General, will continue to use the NovedeaTraining.com domain for now.  Please let me know if you run into any issues.

Thanks,
Murali Mallina
CTO/BI Solutions Architect
Cell: 469-955-5297 // Off : 214-556-6263/214-736-7435
NOVEDEA SYSTEMS Inc. l 1750 N Collins Blvd, #212 Richardson TX 75080
One of the 100 Most Promising Big Data Companies in the world(May 2014, CIO Review)
http://www.novedea.com

209. On or near the date it was sent, Dasari received the email above, read it, and understood it.

210. Afterwards, the website https://app.colaberry.com was launched with deep integration into the existing open source DNN platform in the backend.

211. The website for novedeatraining.com was updated as of May 2014 to include a banner at the top saying "Novedea Training is now Colaberry School of Data Analytics."

212. Around 2014, Colaberry had a soft launch of the technology platform.

213. However, by the end of 2014, feedback from trainees led to the conclusion that the software platform based on the open-source modules were not suitable for successful and scalable training.

214. During this time, everyone, including Dasari, understood that Colaberry would work only on direct B2C and B2B client business (training / consulting) and Novedea would continue to work in the third-party placement business, which had been Novedea's primary revenue driver.

215. On September 9, 2014, Colaberry and Novedea contractually entered into a Master Agreement ("MSA") to formalize the above understandings to transition to the Colaberry platform for direct B2C and B2B client business.

216. Under the Master Agreement, Novedea agreed to support Colaberry's operations and software development as a contract services provider.

217. Colaberry would own all rights to all IP developed by Novedea, if any, under the Master Agreement and any related Statement of Work, subsequent H1B sponsorships, or Purchase Orders.

218. Also, there was an understanding that Novedea would also have the right to place trainees at no talent acquisition fee to Colaberry.

219. Novedea would also provide sub-contracting resources that are required by Colaberry and its clients' projects.

220. Dasari executed the Master Agreement on behalf of Novedea.

221. Dasari read, understood, and agreed to the terms of the Master Agreement before he signed it on behalf of Novedea.

222. Around this same time toward the end of third quarter 2014, the novedeatraining.com website started giving problems because the open source DNN software was not able to support the growing needs of the trainees and the evolving complexity of the business.

223. Software development under the Master Agreement focused initially on leveraging the existing Novedea CRM.

224. But eventually the focus shifted to developing a new platform from the ground up within Colaberry.

225. This new platform became the "Colaberry Career Pathways Platform" ("CCPP").

226. All the work on the CCPP was performed by Colaberry employees or Novedea employees/contractors under the terms of the Master Agreement.

227. Dasari never objected to the development of the CCPP or the business decisions concerning the development of the CCPP.

228. Around the fourth quarter of 2014, Mallina integrated into the app.colaberry.com platform the video server platform that Katamaraja created.

229. Mallina also integrated Twilio into the CCPP to make audio calls using VOIP.

230. During the fourth quarter of 2014, Colaberry launched the Hadoop Big Data class and Katamaraja was the main instructor.

231. These free self-learning Hadoop classes were launched using the CCPP.

232. Vimeo video service was also integrated into app.colaberry.com to upload videos recorded by trainees and make them available for external recruiters and hiring managers.

233. During the first quarter of 2015, significant software changes and integrations were completed for the new CCPP.

234. First, Mallina completed PayPal payments integration into the new platform.

235. The PayPal integration was a huge milestone for the Colaberry as previously there was a leakage of the training dollars that are collected as cash.

236. Additionally, the class leaderboard was launched.

237. The sales module was also launched to help with the placements of students, along with digital course completion certificates.

238. Eventbrite integration was also completed to help pull event attendee data.

239. Features to permit a white labelled portal were also launched.

240. During the second quarter of 2015, paid Hadoop Big Data classes were launched with the core platform still running on the open source DNN based CRM.

241. Because Mallina was able to integrate the video server Katamaraja created into the new Colaberry platform, a natural path was to also port the "Interview Prep" module as part of the transition.

242. During this time, further changes to the software were completed.

243. The placement analytics feature was launched to start having better visibility into placements.

244. However, issues with video recording continued to persist as more users started using the system.

245. A new user profile was launched which aggregated the data from the open source DNN based database and presented it in a better way.

246. Based on Katamaraja recommendation, Mallina implemented the Cuda Sign electronic

signature pipeline.

247. During the third quarter of 2015, SMS notifications feature were launched.

248. The Marketing automation module development was also started.

249. New student profile creation and enrollment into a course were also launched.

250. However, during this time, Mallina started reporting that the school operations team was not working as expected.

251. In 2015, Dasari started looking to buying a new office building based on the recommendation of Sanjeev Yadav as the current location needed upgrading.

252. In 2015, Katamaraja started discussions with Roxbury Community College (RCC) in Boston to potentially launch a remote program and a white labelled platform https://rcc.colaberry.com.

253. The core CRM was still running in an open source DNN platform at this time and there was no concrete date when the proprietary Colaberry platform would go live.

254. Around this time, Mallina launched the Tableau training program, and Muwwakkil launched the Qlikview training program as additional Colaberry offerings.

255. During the fourth quarter of 2015, more changes to the software were completed.

256. Video profiles to share with external recruiters and hiring managers were launched.

257. A Data Science with R class also gained traction.

258. Passionate discussions arose around the strategy and direction to take the Colaberry platform to get to next level.

259. The marketing module also reached a release stage, and the email server was upgraded to Mandrill.

260. During this time, Mallina pushed for more investment into the CCPP platform to enable

aggressive growth.

261. Katamaraja then hired Xujie ("Oliver") Weng as a Novedea sub-contractor to work for Colaberry on its CCPP from the Boston office to accelerate innovation.

262. Oliver recommended Cameratag as an alternative solution to be used to resolve persisting video server problems and Mallina released integration with IBM Watson voice transcription.

263. Colaberry training offerings expanded to include MS SQL, HADOOP, TABLEAU and QLIKVIEW.

264. Roxbury Community College (RCC) data analytics class was also launched to experiment with remote learning delivery.

265. Around this time in 2015 was when Dasari launched an initiative to enter the Chicago market with the objective of placing people at third-party companies through Novedea.

266. Dasari also launched Colaberry's remote training programs in Chicago as a way to start gaining market attention.

267. Additionally, pursuant to the Master Agreement, Novedea deployed multiple developers from 2015 through at least 2019 to support Colaberry with operations in both training and in software development, with purchase orders signed by Dasari.

268. During the first quarter of 2016, Dasari and Mallina began working on building a large team of Novedea developers and project managers in the Dallas office to work on the client projects.

269. One of Novedea's clients was Colaberry and the project Novedea worked on was Colaberry's now proprietary CCPP.

270. By the end of the first quarter of 2016, the software development team working for Colaberry on CCPP included at least the following individuals from both Novedea and Colaberry:

| Project Team | Member Title | Company |
|---|---|---|
| Murali Mallina | CTO | Novedea and Colaberry project |
| Ali Muwwakkil | CAO | Novedea and Colaberry project |
| Alex Gibson | Product Manager | Colaberry |
| Juliet Odima | Project Manager | Colaberry |
| Tarun Aleti Jr. | Data Scientist | Novedea |
| Ranjit Shamanna | Systems Analyst | Novedea |
| Xinyin Wang | Systems Analyst | Novedea |
| Oliver Weng | Java Script Developer | Novedea and Colaberry projects on-site in Boston |
| Manasa Paidimarry | Business Intelligence Developer | Novedea |
| Jili Huang | User Experience Designer | Colaberry |

271. During this timeframe, Muwwakkil again renewed the novedeatraining.com domain for one year.

272. Oliver also provided coding documentation to integrate new online video recording features and deployed the video recording code on www.filter-ed.co and started testing it.

273. Oliver started working on lead tracking and conversion features for CCPP and collaborated with Mallina.

274. Oliver also got involved in the RCC program technical support with QR code features being developed.

275. And the job postings feature was also launched CCPP at this time.

276. Katamaraja observed that the market was starting to adopt Data Science and there would be a need for Colaberry to position itself as a leader in the data science arena.

277. To achieve that goal, Katamaraja started working on putting together a self-service learn-by-doing data science platform using the open source JupyterHub platform.

278. Katamaraja hired MicroPyramid from India because they are Python experts and started building the platform.

279. Oliver started providing technical oversight to the offshore team.

280. In first quarter 2016, Katamaraja started talking to YearUp.org, a non-profit organization

that is dedicated to working with at-risk inner-city youth to bring talented young adults and top companies together to launch careers, power business, and build community.

281. The goal was to provide a custom Colaberry platform to YearUp so that we could empower inner city youth to get re-skilled and transition into good paying jobs and careers.

282. YearUp responded very positively and agreed to launch a pilot in their San Diego and San Francisco locations in the fall of 2016.

283. That started a flurry of activity over the next two quarters to customize the Colaberry platform and content to meet the needs of YearUp students and clients.

284. Colaberry had to innovate, design, develop and customize the Colaberry platform and launch a custom portal https://yearup.colabery.com and had to develop custom content for YearUp based on the specifications given by their client Facebook.

285. Colaberry also created on-demand AWS cloud instances to provide access to affordable computers so that the inner-city youth have access to high quality computing tools 24x7 from anywhere.

286. That was a game changing innovation which allowed hundreds of inner-city youth transition into good paying technology careers in Silicon Valley technology companies.

287. In 2016, Novedea's financial situation was very precarious.

288. Novedea's Dallas office staff started to report to Katamaraja that they were not being paid on time by Dasari.

289. Dasari then went on sabbatical from Novedea and Colaberry in 2016.

290. Dasari's sabbatical from Novedea and Colaberry lasted until the later part of 2018.

291. So Katamaraja worked hard to salvage Novedea and started streamlining the entire business from scratch.

292. First and foremost, Katamaraja made sure all people who were working with Colaberry and Novedea were paid according to commitments and on time.

293. Due to the difficulty in getting paid by Dasari through Novedea, Mallina and Muwwakkil ceased providing services to Colaberry as subcontractors from Novedea.

294. Instead, from September 2016, Mallina started providing contracting software development services through his company "Mobile First Solutions" directly to Colaberry and continued to work to develop the proprietary Colaberry Career Pathway Platform until March 2018.

295. Similarly, Muwwakkil started providing his services from October 2016 until May 2018 directly to Colaberry as a contractor.

296. In June 2018 Muwwakkil converted to a full-time employee of Colaberry.

297. During the fourth quarter of 2016, YearUp signed a SOW with Colaberry and had a custom CCPP portal (https://yearup.colaberry.com), which was launched with bespoke content.

298. YearUp was invoiced by Colaberry for the services and payment was received in the same quarter.

299. Colaberry's cutting edge innovative work with YearUp allowed hundreds of at-risk inner-city youth to transition into good paying technology careers at Fortune 1000 companies such as Facebook, Google, Uber, Cisco, Linkedin, Yahoo, Ebay, Paypal, Tesla, AutoDesk, Symantec, Bank of the West, GE Digital, Kaiser Permanente, Walmart, Chevron, Quantcast, Workday, Silicon Valley bank, Visa, Chan Zuckerberg Foundation etc.

300. In August 2017, YearUp sent Colaberry a thank you letter about the impact that Colaberry had on the YearUp students.

301. YearUp continues to use https://yearup.colaberry.com platform to this day and continues to pay a usage fee to CCPP.

302. Also in the fourth quarter 2016, the Colaberry team and Katamaraja met with the Bartech team to discuss a proposed pilot program to conduct assessments across their customer's enterprise.

303. This was a dream opportunity for any entrepreneur to work closely with a multi-billion-dollar enterprise client, build trust by going above and beyond to exceed the expectations of a client, and customize Colaberry platforms to meet enterprise standards and potentially generate millions of dollars of revenue in future business opportunities.

304. To start accommodating the pilot of the assessment tool, Filtered.ai was registered and custom workflows were developed.

305. TalentIQ API integration for 360-degree profile development was also started.

306. Sphere Engine integration was explored to enable dynamic code compilation, code assessment and code quality measurement.

307. Mallina also advised to start using Sphere Engine to make the assessments inside the career pathways platform.

308. Colaberry school of data analytics was set up in Filtered as an organization so that trainees can start taking assessments and build their profiles.

309. Mallina started looking into developing analytics for Filtered.

310. This was slow progress on the Refactored platform as the underlying open source JupyterHub platform was still not fully stable and that created challenges for coders to develop flexible features.

311. During the first quarter of 2017, Katamaraja started working with Muwwakkil to move towards building a deferred payment model based on successful job placement for students.

312. The Colaberry team started working on building a group of alumni mentors to assist with helping trainees get jobs.

313. SCALA training was launched by Mallina to upskill java developers into SCALA developers.

314. During the second quarter of 2017, self-service enrollment by students and recruiters was also launched.

315. Also in the second quarter, "https://training.colaberry.com" was launched to make it explicit for users to navigate to training offerings of Colaberry.

316. During the fourth quarter of 2017, Colaberry began an initiative to launch an instructor led remote learning class for Data Science.

317. Data Science and Machine Learning courses started getting built into Colaberry career pathways platform using the content that was created on Refactored.ai platform.

318. An initiative to pilot launch data analytics and data science programs in India in collaboration with Infogrex.com also started at this time.

319. During the first quarter of 2018, Katamaraja focused the Colaberry team on building Trust for the Colaberry brand inside and outside the company.

320. All company decisions and actions would be oriented towards establishing trust.

321. We transitioned from the video server to CameraTag software.

322. The measured theory blog was published based on content in Refactored.ai.

323. And Marketing of Data Science training programs were started.

324. Colaberry also implemented and adopted the Basecamp project management tool to start tracking the projects and tasks across multiple teams seamlessly.

325. During the second quarter of 2018, Mallina quit working at Colaberry because he decided to move on to pursue different things in his life.

326. During the second half of 2018, Katamaraja entered the Colaberry solution into a Work of

the Future solutions global competition at MIT SOLVE where participants from 110 countries

submitted more than 1100 solutions, and the Colaberry solution won the global championship and

got recognized as the "Most Promising Work of the Future Solution" (See:

https://youtu.be/WBCW0CeCFag), validating years of work by the Colaberry team developing

solutions that provides career pathways to people on the other side of the track.

327. Colaberry also won the General Motors Prize for Advanced Technologies, Patrick J.

McGovern Foundation Artificial Intelligence for Betterment of Humanity Prize and Community

Award for Most Favorable Solution.

328. During the first quarter of 2019, Katamaraja focused the team on scaling Trust in

Colaberry both internally and externally.

329. All company decisions and actions would be oriented towards scaling Trust.

330. Katamaraja was invited to present at the United Nations Institute of Training and Research

(UNITAR) (See: https://youtu.be/x9imLuYIJBI about our work).

331. Katamaraja hired a UX team to start giving a new look and feel to the entire Colaberry

product line.

332. Katamaraja also kicked off a single sign on initiative to make sure there was one login for

all Colaberry systems.

333. Additionally, during this time in 2019, Filtered looked to close about a $2.3 million seed

round.

334. However, Dasari insisted that Paul Bilodeau (a key person at Colaberry who was involved

in Filtered too) should renounce any claims to equity in Colaberry.

335.  Otherwise, Dasari would not agree to sign off on the Filtered deal.

336. Dasari's demand was conveyed by Raj Akula to Paul, who agreed to renounce any equity

in Colaberry to obtain Dasari's consent to close the Filtered seed round.

337. Dasari subsequently signed off on the deal.

338. In early 2020, Dasari caused Novedea to file a copyright registration for what it called "Learning Management System and Job Readiness Program."

339. Dasari did not have the authority to file this Copyright registration application.

340. The "Learning Management System and Job Readiness Program" was assigned Registration Number TX0008840572.

341. The source code that was submitted in support of the "Learning Management System and Job Readiness Program" copyright was actually source code that belongs to Colaberry and is part of the code base of CCPP.

342. Specifically, the code that was submitted by Dasari as part of the Novedea copyright deposit represents approximately 1.2% of the total files in the CCPP codebase and represents 1.32% of the size of the code in the codebase of the CCPP.

343. 12 out or 14 stored procedures names included in this "deposit" start with "CB_", which is the naming convention used to represent Colaberry.

344. And the namespace used in the C# code files from the Novedea copyright deposit is 'namespace CBOnline', which clearly represents 'Colaberry' Online system.

345. All of the source code of the CCPP is a trade secret belonging to Colaberry.

346. After Dasari returned from his sabbatical, his relationship with Katamaraja began to deteriorate.

347. In 2019, in order to resolve the disputes and allow Dasari and Katamaraja to move on, Dasari indicated that he would like to sell his shares to Katamaraja.

348. During the discussions throughout 2019, Dasari became increasingly hostile and started

threatening, harassing, intimidating Katamaraja, his family in the USA and India, and employees of

Colaberry and Novedea to the point that Katamaraja felt threatened enough to document this

behavior and report it to the FBI.

349. Dasari even made death threats against Katamaraja and his family.

350. Dasari also manipulated and submitted fraudulent Novedea Financials to banks, showing

hundreds of thousands of dollars more revenues than what it was generating in 2019.

351. Dasari submitted them to Legacy Texas Bank to access funds from the Line of Credit.

352. Dasari also instructed the Novedea accounts manager to stop payroll for Katamaraja.

353. Based on Dasari's behavior and negative impact on Colaberry, Katamaraja terminated

Dasari's role as Secretary and COO of Colaberry on April 16, 2020.

---

**WRITTEN CONSENT
OF THE
BOARD OF DIRECTORS
OF
COLABERRY INC.**

The undersigned, being the sole member of the Board of Directors (the "*Board*") of Colaberry Inc., a Delaware corporation (the "*Corporation*"), hereby waives notice of the holding of a meeting of the Board and consents to adoption of the following resolutions and the recording thereof among the minutes of proceedings of the Corporation:

**Removal of Chief Operating Officer and Secretary**

WHEREAS, the Board believes it is in the best interests of the Corporation to terminate Anand Dasari's ("*Dasari*") employment with the Corporation and to remove Dasari from each of his officer positions with the Corporation, including from his position as Chief Operating Officer and Secretary.

RESOLVED, that pursuant to the Corporation's Bylaws and the Delaware General Corporation Law (the "*DGCL*"), Dasari is hereby removed from the offices of Chief Operating Officer and Secretary of the Corporation and all other officer positions which he holds on behalf of the Corporation.

FURTHER RESOLVED, that the undersigned Director of the Corporation, Ram Katamaraja ("*Katamaraja*"), also being the Corporation's President and Chief Executive Officer, is hereby authorized and empowered to take such other actions, including the expenditure of funds, and to sign such other documents as may be necessary or advisable to terminate Dasari's employment with the Corporation.

354. Based on Dasari's behavior and negative impact on Novedea, Katamaraja terminated

Dasari's role as Secretary and COO of Novedea on April 16, 2020.

---

**WRITTEN CONSENT
OF THE
BOARD OF DIRECTORS
OF
NOVEDEA SYSTEMS, INC.**

The undersigned, being the sole member of the Board of Directors (the "**Board**") of Novedea Systems, Inc., a Texas corporation (the "**Corporation**"), hereby waives notice of the holding of a meeting of the Board and consents to adoption of the following resolutions and the recording thereof among the minutes of proceedings of the Corporation:

**Removal of Officer**

WHEREAS, the Board believes it is in the best interests of the Corporation to terminate Anand Dasari's ("**Dasari**") employment with the Corporation and to remove Dasari from each of his officer positions with the Corporation.

RESOLVED, that pursuant to the Texas Business Organizations Code (the "**TBOC**"), Dasari is hereby removed from all officer positions which he holds on behalf of the Corporation.

FURTHER RESOLVED, that the undersigned Director of the Corporation, Ram Katamaraja ("**Katamaraja**"), also being the Corporation's President and Chief Executive Officer, is hereby authorized and empowered to take such other actions, including the expenditure of funds, and to sign such other documents as may be necessary or advisable to terminate Dasari's employment with the Corporation.

---

355. As a result, Dasari has no authority to act on behalf of either Colaberry or Novedea.

356. Dasari had no legal authority to hire attorney's on behalf of Novedea.

357. Dasari had no legal authority to direct attorneys to file this lawsuit on behalf of Novedea.

358. Dasari had no authority to hire Ryan Botkin or John Saba, Jr. to represent Novedea.

359. Dasari had no authority to hire Gene Hamm II or John P. Martin to represent Novedea.

360. Dasari had not authority to hire The Hamm Firm to represent Novedea.

361. The Hamm Firm filed this lawsuit on behalf of Novedea without properly investigating

whether Dasari had the authority to hire them.

362. Dasari lacks both the actual and apparent authority to sign attorney retainer agreements on

behalf of Novedea.

363. Novedea has not authorized the filing of any claims against Colaberry or Katamaraja.

## VI.  COUNTERCLAIMS

### Counterclaim I – Breach of Fiduciary Duty

364. Counterclaim-Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

365. The Delaware Supreme Court has held that officers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty. *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009)

366. The Duty of Care requires informed, deliberative decision-making based on all material information reasonably available.

367. Duty of Loyalty requires acting (including deciding not to act) on a disinterested and independent basis, in good faith, with an honest belief that the action is in the best interests of the company and its stockholders.

368. On January 22, 2012, Kotamaraja appointed Dasari as the Secretary of Colaberry.

369. On April 16, 2020, Colaberry's Board of Directors removed Dasari's as the Secretary and Chief Operating Officer of Colaberry.

370. Both the Secretary and Chief Operating Officer of a Delaware corporation are corporate officers that owe the corporation fiduciary duties of care and loyalty.

371. Accordingly, Dasari was a fiduciary of Colaberry from January 22, 2012 until April 16, 2020, which Dasari admitted in paragraph 56 of the First Amended Answer (Dkt. 18): "A fiduciary relationship exists between the parties…"

372.  Dasari breached his fiduciary duties to Colaberry by undertaking the following actions while serving as a corporate officer for Colaberry:

(a)  Taking Colaberry's source code and claiming it belongs to Novedea.

(b)  Publicly filing Colaberry's trade secret source code at the U.S. Copyright Office.

(c)  Obtaining a copyright for Colaberry's source code on behalf of Novedea.

(d)  Using that fraudulently obtained copyright to sue Colaberry and Katamaraja for copyright infringement in this case.

(e)  Refusing to renew Colaberry's lease of Novedea's office space at the end of 2019.

373. These actions constitute breaches of Dasari's fiduciary duties because they were undertaken to create additional negotiation leverage for Dasari in negotiations with Katamaraja to buyout Dasari's Colaberry shares and as retaliation against Katamaraja.

374. Colaberry has been damaged by Dasari's breach of fiduciary duty in at least two ways: (i) Colaberry's trade secret source code has been made public reducing its value, (ii) Colaberry has been forced to defend itself against copyright infringement claims in this case, and (iii) Colaberry was forced to move its Texas operations to a new location.

375. Katamaraja has been damaged by Dasari's breach of fiduciary duty because he has been forced to defend himself in this case as a result of Dasari's breaches of his fiduciary duty.

376. Counterclaim-Plaintiffs are therefore entitled to an award of damages adequate to compensate for Dasari's breach of his fiduciary duties and any other such relief as the Court may deem appropriate.

## Counterclaim II – Trade Secret Misappropriation (DTSA)

377. Counter-Claim Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

378. Counter-Claim Plaintiff's bring this claim for Trade Secret Misappropriation under the Defend Trade Secrets Act 18 U.S.C. § 1836(b)(1).

379. Dasari owed fiduciary duties to Colaberry as explained above.

380. In his role as an officer of Colaberry, Dasari had access to the proprietary source code for

Colaberry's Career Pathways Platform ("CCPP").

381. Colaberry has spent years and over $5 million dollars developing its proprietary CCPP source code.

382. Colaberry's CCPP is proprietary software that it uses to drive its business. a

383. CCPP is valuable to Colaberry because it is proprietary.

384. It would take multiple years and millions of dollars for Colaberry's competitors to create a platform like CCPP.

385. The CCPP platform is Colaberry's primary competitive advantage in the marketplace.

386. Colaberry takes reasonable precautions to keep its CCPP source code secret, which include but are not limited to limiting access to the CCPP source code, password protections, and access to the base code.

387. Sometime in 2019 or early 2020, using his access as an officer of Colaberry, Dasari downloaded at least the proprietary CCPP source code that was produced by Dasari in this lawsuit as bates numbers DASARI000106-164.

388. Dasari then used this Colaberry CCPP source code as the mandatory deposit for an application for copyright registration that Dasari had submitted to the U.S. Copyright Office on behalf of Novedea Systems, Inc. that was assigned Registration Number TX 8-840-572.

389. In other words, Dasari took Colaberry's CCPP source code and used it to obtain a registered copyright for Novedea.

390. Dasari knew, or had reason to know, because of his role as an officer of Colaberry that he had a duty to maintain the secrecy of Colaberry's CCPP source code.

391. This harms Colaberry because it is in effect an unauthorized transfer of Colaberry's proprietary CCPP product to Novedea and it makes a portion of Colaberry's CCPP's source code

publicly available.

392. Dasari undertook these actions secretly without permission from anyone else at Colaberry or Novedea.

393. Dasari did not have the authority to unilaterally transfer proprietary source code from Colaberry to Novedea.

394. Dasari did not have the authority to deposit that misappropriated source code at the U.S. Copyright Office, thereby making it publicly available.

395. Dasari did not have the authority to apply for any copyrights on behalf of either Novedea or Colaberry.

396. Dasari undertook these actions solely for his own benefit to obtain additional leverage in negotiations with Katamaraja to buy out Dasari's shares of Novedea and Colaberry, which were taking place in late 2019 and early 2020.

397. Dasari took these actions willfully, and/or in reckless disregard for Colaberry's rights, in that Dasari knew that he was not authorized to publicly disclose Colabarry's CCPP source code to obtain a registered copyright for Novedea.

398. As a direct result of Dasari's misappropriation of Colaberry's trade secrets, Colaberry has suffered and will suffer actual losses in an amount to be determined at trial.

399. Under 18 U.S.C. § 1836(b)(3)(C), Colaberry is entitled to exemplary damages for Defendants' willful and malicious misappropriation of Colaberry's trade secrets.

400. Under 18 U.S.C. § 1836(b)(3)(D), Colaberry is entitled to recovery of its attorney's fees because of Dasari's willful and malicious misappropriate of Colaberry's trade secrets.

### Counterclaim III – Trade Secret Misappropriation (TTSA)

401.  Counter-Claim Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

402. Counter-Claim Plaintiff's bring this claim for Trade Secret Misappropriation under the

Case 6:20-cv-00180-JDK   Document 77   Filed 02/26/21   Page 40 of 43 PageID #:  2608

Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code § 134A.001 et seq.

403. Dasari owed fiduciary duties to Colaberry as explained above.

404. In his role as an officer of Colaberry, Dasari had access to the proprietary source code for Colaberry's Career Pathways Platform ("CCPP").

405. Colaberry has spent years and over $5 million dollars developing its proprietary CCPP source code.

406. Colaberry's CCPP is proprietary software that it uses to drive its business. a

407. CCPP is valuable to Colaberry because it is proprietary.

408. It would take multiple years and millions of dollars for Colaberry's competitors to create a platform like CCPP.

409. The CCPP platform is Colaberry's primary competitive advantage in the marketplace.

410. Colaberry takes reasonable precautions to keep its CCPP source code secret, which include but are not limited to limiting access to the CCPP source code, password protections, and access to the base code.

411. Sometime in 2019 or early 2020, using his access as an officer of Colaberry, Dasari downloaded at least the proprietary CCPP source code that was produced by Dasari in this lawsuit as bates numbers DASARI000106-164.

412. Dasari then used this Colaberry CCPP source code as the mandatory deposit for an application for copyright registration that Dasari had submitted to the U.S. Copyright Office on behalf of Novedea Systems, Inc. that was assigned Registration Number TX 8-840-572.

413. In other words, Dasari took Colaberry's CCPP source code and used it to obtain a registered copyright for Novedea.

414. Dasari knew, or had reason to know, because of his role as an officer of Colaberry that he

had a duty to maintain the secrecy of Colaberry's CCPP source code.

415. This harms Colaberry because it is in effect an unauthorized transfer of Colaberry's proprietary CCPP product to Novedea and it makes a portion of Colaberry's CCPP's source code publicly available.

416. Dasari undertook these actions secretly without permission from anyone else at Colaberry or Novedea.

417. Dasari did not have the authority to unilaterally transfer proprietary source code from Colaberry to Novedea.

418. Dasari did not have the authority to deposit that misappropriated source code at the U.S. Copyright Office, thereby making it publicly available.

419. Dasari did not have the authority to apply for any copyrights on behalf of either Novedea or Colaberry.

420. Dasari undertook these actions solely for his own benefit to obtain additional leverage in negotiations with Katamaraja to buy out Dasari's shares of Novedea and Colaberry, which were taking place in late 2019 and early 2020.

421. Dasari took these actions willfully, and/or in reckless disregard for Colaberry's rights, in that Dasari knew that he was not authorized to publicly disclose Colabarry's CCPP source code to obtain a registered copyright for Novedea.

422. As a direct result of Dasari's misappropriation of Colaberry's trade secrets, Colaberry has suffered and will suffer actual losses in an amount to be determined at trial.

423. Under Tex. Civ. Prac. & Rem. Code § 134A.004(b), Colaberry is entitled to exemplary damages for Defendants' willful and malicious misappropriation of Colaberry's trade secrets.

424. Under Tex. Civ. Prac. & Rem. Code § 134A.005, Colaberry is entitled to recovery of its

attorney's fees because of Dasari's willful and malicious misappropriate of Colaberry's trade secrets.

### Counterclaim IV - Declaratory Judgment of Ownership of Registered Copyright

425.  Counter-Claim Plaintiff incorporates incorporate the foregoing paragraphs as if fully set forth herein.

426. Pursuant to 28 U.S.C. § 2201 et seq., Colaberry seeks a declaratory judgment that it owns U.S. Copyright Registration Number TX 8-840-572 due to Dasari and Novedea's improper possession of Colaberry's trade secret CCPP source code as described above.

### VII. RELIEF

WHEREFORE, Colaberry seeks the following relief:

    (a) Judgment be entered in favor of Colaberry and against Plaintiffs for all claims in Plaintiffs' Second Amended Complaint;

    (b) Judgment in favor of Colaberry on all Counterclaims;

    (c) Declare that Colaberry owns U.S. Copyright Registration Number TX 8-840-572;

    (d) An award of damages in an amount to be proven as to each Counterclaim;

    (e) Exemplary damages for Counterclaims II and III;

    (f) Costs, expenses, and attorneys' fees associated with this case;

    (g) Pre- and Post-judgment interest;

    (h) Any other relief that Court deems just and proper.

Dated:  February 26, 2021    Respectfully submitted,

           *s/ Rajkumar Vinnakota*
           Rajkumar Vinnakota, Attorney-in-Charge
           Texas Bar No. 24042337
           Sean N. Hsu
           Texas Bar No. 24056952
           JANIK VINNAKOTA LLP
           8111 LBJ Freeway, Suite 790
           Dallas, TX 75251
           Tel.: (214) 390-9999
           Fax: (214) 586-0680
           kvinnakota@jvllp.com
           shsu@jvllp.com

           COUNSEL FOR DEFENDANT
           COLABERRY, INC.

## **CERTIFICATE OF SERVICE**

   I certify that a copy of this pleading was electronically filed with the Clerk of the Court on

February 26, 2021 by using the CM/ECF system which will send a notice of electronic filing to

Filing Users and that each attorney representing the Plaintiff is a filing user.

           *s/ Rajkumar Vinnakota*
           Rajkumar Vinnakota